UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

ALLIED WORLD SURPLUS LINES          )
INSURANCE COMPANY, and ALLIED       )
WORLD ASSURANCE COMPANY,            )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )      Civil Action No. 2:17-cv-04286
                                    )
DAY SURGERY LIMITED LIABILITY       )
COMPANY, d/b/a/ DAY SURGERY         )
CENTER, LLC, J.L., A.G., Je. W.and Ja. W.,  )
                                    )
            Defendants.             )

### COMPLAINT

Plaintiffs, Allied World Surplus Lines Insurance Company (formerly known as Darwin

Select Insurance Company) ("AWSLIC") and Allied World Assurance Company ("AWAC")

(collectively, "Allied World"), for their complaint against defendants Day Surgery Limited

Liability Company, d/b/a Day Surgery Center, LLC ("Day Surgery Center"), and individuals

J.L., A.G., Je. W. and Ja. W. (because the underlying plaintiffs are alleged sexual assault victims,

their initials will be used), allege upon information and belief as follows:

### NATURE OF ACTION

1.      This is an action for declaratory judgment, to determine the rights and obligations

of Allied World with respect to a professional liability insurance policy and an umbrella

insurance policy (collectively, the "Policies") issued to Day Surgery Center in regard to several

underlying matters, including a putative class action complaint, that arise out of alleged sexual

misconduct.

PARTIES

2.      Allied World Surplus Lines Insurance Company is an Arkansas corporation with its principal place of business in New York.

3.      Allied World Assurance Company is a Delaware corporation with its principal place of business in New York.

4.      Day Surgery Center is a West Virginia limited liability company.  Upon information and belief, its member, Francis Saldanha, M.D., is a resident of West Virginia.

5.      J.L., upon information and belief, is a citizen of West Virginia.

6.      A.G., upon information and belief, is a citizen of West Virginia.

7.      Je. W., upon information and belief, is a citizen of West Virginia.

8.      Ja. W., upon information and belief, is a citizen of West Virginia.

9.      Allied World seeks a declaration regarding greater than $75,000 worth of potential insurance coverage, exclusive of interest and costs.

JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant 28 U.S.C. § 1332.  There is complete diversity of citizenship between the plaintiffs and the defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.      This Court has personal jurisdiction over Day Surgery Center as it is located in this District.

12.     This Court has personal jurisdiction over J.L. because J.L. is, upon information and belief, a citizen of West Virginia.

13.     This Court has personal jurisdiction over A.G. because A.G. is, upon information and belief, a citizen of West Virginia.

2

14.     This Court has personal jurisdiction over Je. W. because Je. W. is, upon information and belief, a citizen of West Virginia.

15.     This Court has personal jurisdiction over Ja. W. because Ja. W. is, upon information and belief, a citizen of West Virginia.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.  A substantial part of the events or omissions giving rise to this claim occurred in this District.

17.     An actual controversy within the meaning of 28 U.S.C. § 2201 exists among the parties regarding the question of whether the policies issued by Allied World provide coverage to Day Surgery Center for several underlying claims that arise out of alleged sexual assaults.

## FACTUAL ALLEGATIONS

### The Claims of Sexual Assault Against Matulis

18.     Steven R. Matulis, M.D. ("Matulis"), was licensed as a medical doctor.  He practiced, at among other places, Day Surgery Center.

19.     A number of Matulis's patients have alleged that he engaged in sexual misconduct while performing procedures on them.  On information and belief, Matulis is the subject of a pending criminal investigation.

#### *J.L. Notice of Claim*

20.     By letter dated July 19, 2016, counsel for J.L., wrote a letter addressed to Day Surgery Center, purporting to be a Notice of Claim (the "J.L. Notice of Claim").  A redacted copy of the J.L. Notice of Claim is attached hereto as Exhibit 1.

21.     The J.L. Notice of Claim purports to provide notice under West Virginia Code § 55-7B-6 of a claim involving alleged medical negligence.  In the J.L. Notice of Claim, J.L. alleges that she received medical care from Day Surgery Center on or about October 16, 2015.

3

J.L. alleges that Day Surgery Center, acting on its own behalf and through its agents, servants and/or employees, was negligent and deviated from the standards of acceptable medical care by, among other things:

- "[P]ermitting Steven Matulis, M.D. or otherwise failing to prevent him from physically touching [J.L.] to uncover and ogle her breasts in a sexual and salacious manner, and making demeaning commentary following the esophagogastroduodenoscopy[.]"

- "Failing to obtain proper and adequate informed consent … as there was no indication in the records that consent for a breast examination of any kind was obtained from [J.L.], nor was a breast examination documented in the records[.]"

- "Fail[ing] to properly advise [J.L.] of conduct that occurred during her procedure on October 16, 2015, including improper assault with regard to her breasts[.]"

- Failing to report the conduct that allegedly took place during [J.L.]'s procedure on October 16, 2015.

- Failing to report conduct that allegedly took place with other patients prior to [J.L.]'s procedure on October 16, 2015.

- "Failing to otherwise properly and adequately assess, treat and/or care for the condition of [J.L.], which required that the medical providers perform only services which were for the medical benefit of [J.L.], and for which they had informed consent[.]"

- "Permitting Steven Matulis, M.D. to perform procedures on [J.L.], when [Day Surgery Center] knew or should have known of his improper and injurious conduct[.]"

- "Failing to properly supervise medical professionals working at [Day Surgery Center], in allowing Steven Matulis, M.D. to perform procedures upon female patients under the circumstances[.]"

- Failing to properly supervise the procedure.

- Failing "to intervene for the safety of the patient …."

- "[P]ermitting, failing to stop, and failing to prevent the misconduct that resulted in the assault to [J.L.]"

- "That there was no medical indication for the assault that occurred upon [J.L.], which was witnessed and permitted by [Day Surgery Center]."

22.     Based on these and other allegations, J.L.'s counsel wrote that a complaint against Day Surgery Center may be based on, but not limited to: medical professional liability, negligent infliction of emotional distress, outrageous conduct, vicarious liability, agency, lack of informed consent, negligent retention, negligent supervision, concealment and joint venture/enterprise. Counsel reserved J.L.'s rights to assert non-medical claims based on, but not limited to: assault and battery, trespass, civil conspiracy, the tort of outrage, concealment and punitive damages.

23.     The J.L. Notice of Claim attached a Screening Certificate of Merit, purportedly signed by a medical doctor who opines that the alleged breaches by Day Surgery Center caused J.L. to suffer physical injury, emotional distress, worry, pain, suffering and disability, and forced J.L. to undergo additional medical care and treatment.

*J.L. Complaint*

24.     On November 18, 2016, J.L. filed a complaint the Circuit Court of Kanawha County, West Virginia, styled *J.L. v. Charleston Gastroenterology Associates, PLLC, et al.*, Civil Action No. 16C1738 (the "J.L. Complaint").   A copy of the J.L. Complaint is attached hereto as Exhibit 2.

25.     Charleston Gastroenterology Associates, PLLC ("CGA"), Matulis, and Day Surgery Center are named as defendants in the J.L. Complaint.   Very generally, Plaintiff alleges that Matulis sexually assaulted her during an esophagogastroduodenoscopy, and that neither CGA nor Day Surgery Center did anything to prevent the assault.

26.     More particularly, the J.L. Complaint alleges that on October 16, 2015, Plaintiff allegedly presented at Day Surgery Center for an esophagogastroduodenoscopy procedure to be performed by Matulis.   Personnel from CGA and Day Surgery Center allegedly assisted with the procedure.   Before undergoing the procedure, J.L. was anesthetized and rendered unconscious.

According to J.L., while unconscious, Matulis removed her hospital gown and "ogl[ed] and/or fondl[ed] her breasts." Matulis allegedly made a comment to CGA's and/or Day Surgery Center's agents, servants or employees about the "lascivious and wrongful purpose for removing" J.L.'s gown before it was removed. J.L. alleges that neither CGA's nor Day Surgery Center's agents, servants or employees intervened to stop the assault, and that the assault was witnessed by one or more of CGA's and/or Day Surgery Center's agents, servants or employees. J.L. Complaint, ¶¶ 18-21.

27.     According to J.L., Matulis has sexually assaulted others, and CGA and/or Day Surgery Center had knowledge of these assaults. Despite this alleged knowledge, J.L. claims that CGA and Day Surgery Center failed to report Matulis's alleged actions and did not suspend Matulis from performing procedures at CGA or Day Surgery Center. In fact, J.L. alleges that even after Matulis's privileges were suspended at another facility (after an alleged sexual assault that took place at that facility was reported to the facility's administration), CGA and Day Surgery Center allegedly did not suspend or revoke Matulis's privileges. CGA and Day Surgery Center also allegedly did not inform J.L. that she had been assaulted while under anesthesia. Rather, J.L. claims that she first learned of the assault when law enforcement contacted her in early 2016. J.L. Complaint, ¶¶ 24-28.

28.     J.L. alleges that Matulis had an agreement with Day Surgery Center to perform procedures at Day Surgery Center, and to work with nurses and other staff at Day Surgery Center. J.L. further alleges that Matulis was an agent and servant for Day Surgery Center, that Day Surgery Center had supervisory and oversight responsibilities for Matulis, and that Day Surgery Center is responsible for Matulis's alleged actions. Finally, J.L. alleges that Day Surgery Center knew or should have known that Matulis had sexually assaulted other female

6

patients, and was unfit to perform procedures on female patients. J.L. Complaint, ¶¶ 8, 13, 30 and 32.

29.     Based on these and other allegations, J.L. asserts the following causes of action against the J.L. Defendants: (1) battery; (2) tort of outrage; (3) negligent and reckless retention and supervision; and (4) negligent and reckless breach of duties of care. J.L. Complaint, Counts I-[IV].   J.L. seeks monetary damages, including punitive damages, interest, costs and attorney's fees. *Id.*

### *A.G. Notice of Claim*

30.     On August 9, 2016, counsel for A.G. wrote a letter to Day Surgery Center purporting to be a Notice of Claim under West Virginia Code § 55-7B-6 (the "A.G. Notice of Claim").   A redacted copy of the A.G. Notice of Claim is attached hereto as Exhibit 3.

31.     The A.G. Notice of Claim purports to give notice of a claim concerning alleged failures to meet the applicable standard of care related to a colonoscopy performed on or about February 18, 2015.

32.     In addition to providing notice on behalf of A.G., counsel provided notice on behalf of "others similarly situated who have suffered the same harm and damages as a result of [Day Surgery Center's] failure to comply with the same applicable standards of medical care."

33.     According to the A.G. Notice of Claim, Day Surgery Center failed "to implement a quality assurance or performance review process (or [did] so in an unreasonable manner) and failed to ascertain that Dr. Matulis was likely performing colonoscopies in an unacceptably rapid manner and likely was impaired when performing colonoscopies on female patients at your facility."  Based on these alleged failures, counsel asserts that Matulis was allowed to maintain privileges at Day Surgery Center and permitted to perform a colonoscopy on A.G.  Because the

procedure allegedly was performed in an unreasonably rapid manner, the results allegedly are not reliable and A.G. must have the procedure repeated. Counsel alleges the same in connection with "a class of female patients over a significant period of time."

34.     Counsel attaches a Screening Certificate of Merit to the letter. Therein, the medical doctor opines on whether a professionally impaired physician can meet the standard of care when performing colonoscopies, and whether the results of such colonoscopies are medically reliable. The medical doctor further opines on the standard of care that hospitals and other medical institutions must meet in connection with quality assurance for physicians who have privileges to perform colonoscopies at the facilities.

35.     According to the medical doctor, while A.G. has no recollection of the procedure performed on her because she was under anesthesia, having recently learned that Matulis is alleged to have sexually assaulted multiple patients while performing colonoscopies on them, A.G. is concerned that she also may have been assaulted by Matulis. The medical doctor further states that A.G. is concerned that "the colonoscopy she received from Matulis was not performed within the standard of care and was not reliable, given his reported proclivity for engaging in sex acts with unconscious female patients during colonoscopies." Based on this information and the medical doctor's review of certain materials, he provides opinions including, but not limited to the following:

- "Given the reported multiple instances of sexual assault on unconscious female patients committed by Dr. Matulis, it is more likely than not that (a) Dr. Matulis has suffered from impaired professional judgment for many years and (b) this impaired judgment has manifested itself with his female patients for many years."

- "The findings from a colonoscopy performed by an impaired physician are not medically reliable and should not be used to make diagnosis decisions about a patient, regardless of whether that patient was actually physically assaulted by the physician in question."

8

- "Hospitals and other medical entities that grant practice privileges to a gastroenterologist should have a quality assurance or other performance review procedure in place to monitor the performance of that physician, including ensuring that the physician is not performing colonoscopies while professionally impaired."

- Matulis' pattern of "perform[ing] colonoscopies in an unacceptably rapid manner … should have alerted those involved in assisting with colonoscopies at the Hospital and Surgery Center that there was inadequate time and attention being devoted to colonoscopies performed by Dr. Matulis.  Further, these variances should have been noted by the Hospital and Surgery Center personnel involved in the procedure and brought to the attention of the Hospital and Surgery Center administration, and the failure to do so was a deviation from the standard of care."

- Day Surgery Center should have had in place a procedure to engage in periodic reviews of the physicians who had privileges at Day Surgery Center.  Such a procedure "would have led to the discovery of the deviations from the standards of care by Dr. Matulis and ultimately would have led to the discovery that he was engaging in inappropriate behavior."

- "Had there been compliance with the standard of care, AG, and patients like her, would have been spared having to undergo an inadequate colonoscopy procedure … and also spared the risk of being sexually assaulted by Dr. Matulis as he carried out his sexual perversion."

### A.G. Lawsuit

36.     On November 16, 2016, A.G., under the pseudonym "Jane Doe," filed a

Complaint styled *Jane Doe v. Steven R. Matulis, MD, et al.*, Civil Action No. 16-C-1723

(Kanawha County, WV), that names Matulis, Day Surgery Center, and CGA as defendants (the

"A.G. Complaint"). A copy of the A.G. Complaint is attached as Exhibit 4.

37.     On or about December 1, 2016, A.G.'s attorney sent a letter to attorney David

Shuman, indicating that A.G. is "Jane Doe."  A redacted copy of the December 1, 2016 letter is

attached hereto as Exhibit 5.

38.     Very generally, A.G. alleges that she and other similarly situated individuals may

have been sexually assaulted by Matulis while they were anesthetized and undergoing

colonoscopies.

9

39.     In particular, she alleges that on or about February 18, 2015, Matulis allegedly performed a colonoscopy on A.G.  Plaintiff, who was anesthetized with Propofol at the time of the procedure, has no memory of the procedure.  After the procedure, Plaintiff allegedly felt "significant soreness in her abdomen for several days."  A.G. Complaint, ¶¶ 7-8.

40.     On or about April 5, 2016, A.G. allegedly learned that Matulis had been sued for sexually assaulting a female patient during a colonoscopy.  A.G. further learned that Matulis's privileges to practice at a local hospital allegedly had been suspended and then terminated as a result of the incident, and that Matulis allegedly had "engaged in a pattern and practice of sexually assaulting female patients during colonoscopies."  A.G. allegedly became concerned that she may have been sexually assaulted by Matulis while anesthetized.  Additionally, A.G. allegedly became concerned that Matulis's alleged "perversions and proclivity for sexually assaulting unconscious female patients during colonoscopies" may have resulted in her colonoscopy being performed in a manner that did not meet the applicable standard of care, and not being medically reliable.  A.G. Complaint, ¶¶ 9-11.

41.     Based on these and other allegations, A.G. asserts two causes of action against Matulis for medical negligence, a cause of action against Matulis for invasion of privacy, a cause of action against CGA for vicarious liability, and a cause of action against Day Surgery Center for negligence.  In the cause of action asserted against Day Surgery Center, Plaintiff alleges that Day Surgery Center failed to have quality assurance and/or other review procedures in place to monitor physicians such as Matulis.  A.G. Complaint, Counts I-V.

42.     Further, Plaintiff seeks certification of a class consisting of "female West Virginia residents who received a colonoscopy from Matulis at Day Surgery Center from 2010 to the present and who do not know whether they were sexually assaulted or otherwise physically

injured by Matulis during said procedures." Plaintiff alleges that the class consists of hundreds, if not more, persons. Finally, Plaintiff seeks monetary damages, including punitive damages, and the establishment of a court-supervised fund to pay for "repeat colonoscopies" for all eligible class members. A.G. Complaint, ¶¶ 34-46.

### J.W. Notice of Claim.

43.     By letter dated March 18, 2016, counsel for Je. W. and Je.W.'s spouse, Ja. W., (collectively, "J.W.") wrote Day Surgery Center to provide notice under West Virginia Code § 55-7B-6 of a claim involving "allegations of medical malpractice and other violations of law by … Dr. Steven Matulis along with other unknown … personnel …." (the "J.W. Notice of Claim"). A redacted copy of the J.W. Notice of Claim is attached hereto as Exhibit 6.

44.     The J.W. Notice of Claim states that for reasons concerning privacy, the details of the J.W claim are not outlined in the letter. Moreover, counsel states his "understanding that [Day Surgery Center] and/or Dr. Matulis already have counsel related to the claims the [J.W.] and other similarly situated patients may make against [Day Surgery Center]."

The Policies

### The Primary Policy

45.     Allied World issued Ambulatory Surgical Centers Professional and General Liability Insurance Policy No. 0303-3351 to Day Surgery Center, LLC for the February 1, 2016 to February 1, 2017 **Policy Period** (the "Primary Policy").[1] Primary Policy, Declarations Items 1 and 2. A copy of the Primary Policy is attached as Exhibit 7.

46.     Pursuant to Endorsement No. 4, and subject to the Primary Policy's terms and conditions, the Primary Policy provides Claims Made Sexual Misconduct coverage. In particular, Endorsement No. 4 provides:

---

[1] Terms in **Bold** are defined in the Primary Policy and/or the Umbrella Policy.

The **Insurer** shall pay, on behalf of the **Insured**, **Loss** and **Defense Expenses** in excess of the Deductible stated below which the **Insured** becomes legally obligated to pay as a result of a **Claim** alleging sexual misconduct or sexual abuse, including, but not limited to, any physical acts or oral statements of a sexually suggestive manner, or any unwelcome physical contact or touching; provided always that:

1.     such **Claim** is first made against the **Insured** during the **Policy Period** or any applicable Extended Reporting Period;

2.     notice of such **Claim** is given to the **Insurer** in accordance with Section IV.B.1 of the Policy; and

3.     the alleged sexual misconduct or sexual abuse takes place after [February 1, 1995].

The **Insurer** will have the right and duty to defend any such **Claim** brought against the **Insured**, and will do so even if the allegations of the **Claim** are groundless, false or fraudulent.

47.     Endorsement No. 4 Claims Made Sexual Misconduct provides that "[t]he coverage provided under this Endorsement shall be subject to the following Limit of Liability:" $1,000,000 per **Claim**, and $3,000,000 in the Aggregate.  Primary Policy, Endorsement No. 4, Section B.1.  Further, the Limit of Liability "shall apply to all allegations set forth in the **Claim** against the **Insured**, regardless of whether or not all such allegations are expressly stated to relate to sexual misconduct or sexual abuse."  *Id.*  The coverage provided under Endorsement No. 4 is subject to a $25,000 per **Claim** Deductible.  *See* Primary Policy, Endorsement No. 4, Section B.2.  The Deductible is included in, and is not in addition to, the Limit of Liability.  *See id.*

48.     The Primary Policy also includes three other Insuring Agreements: I.A., Claims Made Professional Liability; I.B., Occurrence-Based General Liability; and I.C., Claims Made

Employee Benefits Liability.[2]  These Insuring Agreements are subject to their own Limits of Liability, set forth in Items 3(a)-(f) of the Declarations.

49.    Endorsement No. 4 provides that if a **Claim** implicates coverage under the Endorsement No. 4's Claims Made Sexual Misconduct coverage, "[n]o other Limit of Liability under this Policy shall be available with regard to such **Claim**."  Primary Policy, Endorsement No. 4, B.1.

50.    Exclusion D.4 of the Primary Policy, which is applicable to Insuring Agreements I.A., Claims Made Professional Liability; I.B., Occurrence-Based General Liability; and I.C., Claims Made Employee Benefits Liability, excludes coverage for any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving "any actual or alleged sexual misconduct or sex abuse, including, but not limited to, any physical acts or oral statements of a sexually suggestive manner, or any unwelcome physical contact or touching[.]"  Primary Policy, III.D.4.

51.    Day Surgery Center is the **Named Insured** under the Primary Policy.  *See* Primary Policy, Declarations, Item 1.

52.    Neither Matulis nor CGA is an **Insured** under the Primary Policy.  *See* Primary Policy, II.L.

53.    **Claim** is defined in the Policy to mean "a written demand seeking monetary damages otherwise covered by this Policy."  Primary Policy, Section II.E.

54.    The Primary Policy provides:

All **Related Claims**, whenever made, shall be deemed to be a single **Claim** and shall be deemed to have been made on the earliest of the following dates:

_____

[2] The Primary Policy also includes coverage for certain Medical Payments. *See* End. No. 5.  That coverage is irrelevant here.

1.      the date on which the earliest **Claim** within such **Related Claims** was received by an **Insured**; or

2.      the date on which written notice was first given to the **Insurer** of an act, error, omission or **Occurrence** which subsequently gave rise to any of the **Related Claims**, regardless of the number and identity of claimants, the number and identity of **Insureds** involved, or the number and timing of the **Related Claims**, and even if the **Related Claims** comprising such single **Claim** were made in more than one **Policy Period**.

Primary Policy, Section IV.C.

55.      The Primary Policy defines **Related Claims** to mean: "all **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events, whether related logically, causally or in any other way." Primary Policy, Section II.CC.

### *The Umbrella Policy*

56.      Allied World issued Healthcare Excess and Umbrella Liability Insurance Policy No. 0305-4101 to Day Surgery Center, LLC for the February 1, 2016 to February 1, 2017 **Policy Period** (the "Umbrella Policy"). *See* Umbrella Policy, Declarations Items 1 and 2. A copy of the Umbrella Policy is attached as Exhibit 8.

57.      The Umbrella Policy has two relevant insuring agreements. First, Insuring Agreement I.A, Umbrella Claims Made Professional Liability provides:

The **Insurer** will pay on behalf of the **Insured,** subject to the Limits of Liability set forth in the Declarations, **Loss** and **Defense Expenses** in excess of the **Applicable Underlying Limit** for the coverage identified in Item 1 of the Schedule of Underlying Insurance or Self- Insurance which the **Insured** becomes legally obligated to pay as a result of a **Claim** alleging a **Medical Professional Incident,** provided always that:

1.      such **Claim** is first made against the **Insured** during the **Policy Period** or any applicable Extended Reporting Period; and

14

2.      notice of such **Claim** is given to the **Insurer** in accordance with Section IV.D. of this Policy.

This Insuring Agreement is only applicable if so indicated in Item 9. of the Declarations.

58.     Item 1 of the Schedule of Underlying Insurance or Self-Insurance identifies Professional Liability coverage provided under the Primary Policy.

59.     Second, Insuring Agreement I.B.1, Umbrella General Liability provides, in relevant part:

The **Insurer** will pay on behalf of the **Insured,** subject to the Limits of Liability set forth in the Declarations, **Loss** and **Defense Expenses** in excess of the **Applicable Underlying Limit** for the coverage identified in Item 2 of the Schedule of Underlying Insurance or Self-Insurance which the **Insured** becomes legally obligated to pay as a result of a **Claim** alleging **Bodily Injury, Property Damage,** or **Personal or Advertising Injury** caused by an **Occurrence;** provided always that:

a.      such **Bodily Injury, Property Damage** or **Personal or Advertising Injury** occurs during the Policy Period; and

b.      notice of such **Claim** is given to the **Insurer** in accordance with Section IV.D. of this Policy.

This Insuring Agreement is only applicable if so indicated in Item 9. of the Declarations.

60.     Item 2 of the Schedule of Underlying Insurance or Self-Insurance identifies Commercial General Liability coverage provided under the Primary Policy.

61.     The Umbrella Policy defines **Applicable Underlying Limit** to mean, in relevant part: "the total of all available limits of liability for the applicable **Underlying Insurance** listed in the Schedule of Underlying Insurance or Self-Insurance . . . ."  Umbrella Policy, II.B.

62.     In turn, **Underlying Insurance** means "the insurance policies identified in the Schedule of Underlying Insurance or Self-Insurance, and any **Self-Insured Retention** identified Schedule of Underlying Insurance or Self-Insurance."  Umbrella Policy, II.MM.

15

63.     The Umbrella Policy provides that the Allied World has no obligation to defend a

**Claim** until any **Underlying Insurance** "has been exhausted by the payment of **Claims** to which

this Policy applies[.]"  Umbrella Policy, VI.B.2; *see also* VI.B.1.

64.     The Umbrella Policy provides:

The **Insurer** is obligated to pay **Loss** under this Policy only after:

> 1.      the underlying insurers have paid their limits of liability, or the
>         **Named Insured** has paid the **Retained Amount** or **Self-Insured
>         Retention**, as applicable;
>
> 2.      the underlying insurers and all **Insureds** have complied with their
>         obligations to defend and pay **Defense Expenses**; and
>
> 3.      a judgment is rendered against any **Insured** after trial, or a written
>         settlement is agreed upon by the **Insured**, the claimants, any
>         underlying insurers and the **Insurer**.

The **Insurer** will then promptly pay on behalf of the **Insured** the amount of **Loss**
covered under the provisions of this Policy.

Umbrella Policy, VI.J.

65.     Exclusion D.19 of the Umbrella Policy, which is applicable to all Insuring

Agreements, excludes coverage for any **Claim** based on, arising out of, directly or indirectly

resulting from, in consequence of, or in any way involving "any actual or alleged sexual

misconduct or sexual abuse, including, but not limited to, any physical acts or oral statements of

a sexually suggestive manner, or any unwelcome physical contact or touching[.]"  Umbrella

Policy, D.19.

### Count I
### Declaratory Judgment Against All Defendants
### Limit of Liability Under the Primary Policy is Limited to $1,000,000

66.     Allied World realleges and incorporates by reference herein the allegations of

paragraphs 1 – 65 of this Complaint.

67.     The J.L. Complaint, the A.G. Complaint, the J.L. Notice of Claim, the A.G.

Notice of Claim, and the J.W. Notice of Claim are all **Related Claims** because they all arise out

of Matulis's alleged sexual perversion and Day Surgery Center's alleged failure to adequately

monitor/supervise Matulis.  Specifically, J.L. alleges that Matulis sexually assaulted her, and that

Day Surgery Center is responsible for Matulis's actions as a result of, among other things, its

alleged failure to supervise him.  Likewise, A.G. alleges that Matulis is impaired by his sexual

perversion, that she and similarly situated individuals may have been sexually assaulted by

Matulis and that his "perversions and proclivity for sexually assaulting unconscious female

patients during colonoscopies" may have resulted in procedures being performed in a manner

that did not meet the applicable standard of care.  A.G. further alleges that Day Surgery Center

failed to supervise/monitor Matulis, and if it had, A.G. and other female patients would not have

suffered the harm that she/they allegedly suffered.  Finally, Je. W. and Ja. W. allege that their

claims are the same as those that other similarly situated patients have made against Day Surgery

Center.

68.     Because the J.L. Complaint, the A.G. Complaint, the J.L. Notice of Claim, the

A.G. Notice of Claim, and the J.W. Notice of Claim constitute **Related Claims**, they are deemed

a single **Claim**.  They are subject to a single $1,000,000 Limit of Liability.  And, Day Surgery

Center need satisfy only a single $25,000 Deductible.  Allied World's obligations under the

Primary Policy with regard to such **Claim** will end once the Limit of Liability stated above has

been exhausted by payment of **Loss** or **Defense Expenses**.  Policy, Endorsement No. 4, Section

B.1.

WHEREFORE, Allied World requests that this Court enter a judgment declaring that the

J.L. Complaint, the A.G. Complaint, the J.L. Notice of Claim, the A.G. Notice of Claim, and the

J.W. Notice of Claim are all **Related Claims**, and are therefore deemed a single **Claim**, subject to a single $1,000,000 Limit of Liability, and a single $25,000 Deductible, and that Allied World's obligations under the Primary Policy with regard to such **Claim** will end once the Limit of Liability stated above has been exhausted by payment of **Loss** or **Defense Expenses**.

### Count II
### Declaratory Judgment Against All Defendants
### Coverage is Excluded Under the Umbrella Policy

69.     Allied World realleges and incorporates by reference herein the allegations of paragraphs 1 – 68 of this Complaint.

70.     Even if coverage would otherwise be available to Day Surgery Center under the Umbrella Policy for the J.L. Complaint, the A.G. Complaint, the J.L. Notice of Claim, the A.G. Notice of Claim, and the J.W. Notice of Claim, any coverage would be excluded by the operation of Exclusion D.19 of the Umbrella Policy, which excludes coverage for any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving: "any actual or alleged sexual misconduct or sexual abuse, including, but not limited to, any physical acts or oral statements of a sexually suggestive manner, or any unwelcome physical contact or touching[.]"

71.     The J.L. Complaint, the A.G. Complaint, the J.L. Notice of Claim, the A.G. Notice of Claim, and the J.W. Notice of Claim are based on, arise out of, directly or indirectly result from, are in consequence of and/or involve the alleged sexual misconduct by Matulis, and therefore Exclusion D.19 applies to exclude coverage under the Umbrella Policy

### RELIEF REQUESTED

WHEREFORE, Allied World respectfully requests that this Court enter a judgment granting it the following relief:

(a)    A judgment declaring that the J.L. Lawsuit, the A.G. Lawsuit, the J.L. Notice of Claim, the A.G. Notice of Claim, and the J.W. Notice of Claim are all **Related Claims**, and are therefore deemed a single **Claim**, subject to a single $1,000,000 Limit of Liability, and a single $25,000 Deductible, and that Allied World's obligations under the Primary Policy with regard to such **Claim** will end once the Limit of Liability stated above has been exhausted by payment of **Loss** or **Defense Expenses**;

(b)    A judgment declaring that coverage for the J.L. Complaint, the A.G. Complaint, the J.L. Notice of Claim, the A.G. Notice of Claim, and the J.W. Notice of Claim is excluded under the Umbrella Policy by Exclusion D.19;

(c)    Reasonable attorneys' fees and costs; and

(d)    All further relief that the Court deems just and proper.

Dated: November 7th, 2017

Respectfully submitted,

_____

OF COUNSEL:

TROUTMAN SANDERS LLP
Charles A. Jones
Richard Ambrow
401 9th Street NW, Suite 1000
Washington, DC 20004
Tel: 202.274.2950
Fax: 202.274.2994
tony.jones@troutmansanders.com
richard.ambrow@ troutmansanders.com

By _____
Charles R. Bailey (WV Bar #0202)
Josef A. Horter (WV Bar # 1790)
BAILEY & WYANT, PLLC
500 Virginia Street, East, Suite 600
Post Office Box 3710
Charleston, West Virginia  25337-3710
(304) 345-4222

*Counsel for Plaintiffs Allied World Surplus Lines Insurance Company and Allied World Assurance Company*