**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

ALLIED WORLD SURPLUS LINES
INSURANCE COMPANY, et al.,

        Plaintiffs,

v.                            CIVIL ACTION NO. 2:17-cv-04286

DAY SURGERY LIMITED
LIABILITY COMPANY, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Before the Court are cross-motions for summary judgment filed by Plaintiffs Allied World Surplus Lines Insurance Company and Allied World Assurance Company (collectively, "Allied World"), (ECF No. 250), Defendants Day Surgery Center, LLC ("Day Surgery") and DS Holdings, Inc. ("DS Holdings") (collectively, "the DS Entities"), (ECF No. 267), and Defendants Je. W., Ja. W., (ECF No. 270), joined by Defendants J.L., Y.T., D.C., T.C., R.L., T.W., R.W., A.G., and P.P. (collectively, "Claimants"), (ECF Nos. 269, 272, 273, 277, 278). For the reasons provided herein, Allied World's motion, (ECF No. 250), is **GRANTED IN PART** and **DENIED IN PART** and the DS Entities and Claimants' motions, (ECF Nos. 267, 269, 270, 272, 273, 277, 278), are **GRANTED IN PART** and **DENIED IN PART**.

## I. *BACKGROUND*

Allied World filed this to determine the scope of coverage afforded under two policies issued to Day Surgery in connection to several state civil actions. (ECF No. 115 at 1 ¶ 1 (Allied

World Compl.).) Claimants have filed separate lawsuits in the Circuit Court of Kanawha County, West Virginia, asserting various theories of liability and allegations of wrongdoing against Day Surgery and others. (*Id.* ¶¶ 36–76.) DS Holdings also is named as a defendant in some of these civil actions. (*Id.* ¶¶ 58, 61, 65, 69.) Although the specific facts giving rise to each alleged instance of misconduct vary from claimant to claimant, each underlying state court action arises from medical procedures that Steven R. Matulis, M.D. ("Matulis") performed on Claimants while they were under anesthesia at a facility operated or managed by the DS Entities. The causes of action asserted against the DS Entities include vicarious liability for alleged sexual abuse by Matulis, negligent and reckless retention and supervision, failure to intervene and protect, failure to report, lack of informed consent, invasion of privacy, fraud, and negligence for breach of the applicable standard of care. (ECF No. 270-7 (J.W. Compl.); ECF No. 115-2 (J.L. Compl.); ECF No. 115-6 (A.G. Compl.); ECF No. 115-10 (D.C. Compl.); ECF No. 115-12 (R.L. Compl.); ECF No. 115-14 (T.W. Compl.); ECF No. 115-15 (Y.T. Notice of Claim); ECF No. 115-18 (P.P. Notice of Claim).)

Allied World issued a professional liability and general commercial insurance policy, Policy Number 0303-3351, to Day Surgery for coverage from February 1, 2016 through February 1, 2017 (the "Primary Policy"). (ECF No. 115-19.) The Primary Policy provides coverage under three separate insuring agreements: (1) Claims Made Professional Liability, (2) Occurrence-Based General Liability, and (3) Claims Made Employee Benefits Liability. Each insuring agreement has a limit of liability of $1 million per claim and $3 million in the aggregate. (*Id.* at 2, 16–17.) Further, the Primary Policy contains language excluding coverage for "actual or alleged sexual misconduct or sexual abuse," (*id.* at 25), but Allied World issued an endorsement to the policy that provides coverage for claims that allege "sexual misconduct or sexual abuse." (*Id.* at 8.)

Allied World also provided an excess insurance policy, Policy Number 0305-4101, to Day Surgery for the same policy period (the "Excess Policy"). (ECF No. 115-20.) The Excess Policy provides coverage under three insuring agreements: (1) Claims Made Professional Liability, (2) Occurrence-Based General Liability, and (3) Excess Follow Form Liability. The Excess Policy, like the Primary Policy, contains a sexual misconduct exclusion. (*Id.* at 11–12, 27.) Further, both of the policies contain a related claims provision, which provides that "[a]ll Related Claims, whenever made, shall be deemed to be a single Claim" and are deemed to have been made when the earliest of the related claims was made.[1] (ECF No. 115-19 at 28–29; ECF No. 115-20 at 33.)

On November 7, 2017, Allied World filed the present declaratory action, asserting complete diversity pursuant to 28 U.S.C. § 1332. (ECF Nos. 1, 115.) On August 2, 2019, Allied World moved for summary judgment.[2] (ECF No. 250.) On September 10, 2019, the DS Entities filed a joint motion for partial summary judgment, (ECF No. 267), and Claimants Ja. W. and Je. W. also filed a motion for partial summary judgment, (ECF No. 270), in which other claimants have joined,[3] (ECF Nos. 269, 272, 273, 277, 278). The parties' cross-motions for summary judgment are fully briefed and ripe for adjudication.

## II.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. This rule provides, in relevant part, that summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when it 'might affect the

---

[1] Where policy language is quoted throughout this Memorandum Opinion and Order, all emphasis has been omitted unless stated otherwise.

[2] The DS Entities and Claimants filed opposition briefs on September 24, 2019, (ECF Nos. 279, 280, 281, 283, 284, 285, 287), and Allied World filed a reply on October 4, 2019, (ECF No. 291).

[3] Allied World filed a combined response to the DS Entities and Claimants' motions on September 24, 2019. (ECF No. 282.) The DS Entities and J.W. filed replies between October 1, 2019, and October 4, 2019. (ECF Nos. 289, 290.)

outcome of the suit under the governing law.'" *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A genuine dispute arises when 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted).

"The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence' . . . ." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). In ruling on a motion for summary judgment, this Court "view[s] the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013)).

On the intersection of the standards for summary judgment and contract interpretation, the Fourth Circuit has observed that the matter of "interpretation is a subject particularly suited for summary judgment . . . ." *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 835 (4th Cir. 1999); *see also Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1, 6 (W. Va. 1998) (stating "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination . . . .") (internal citation omitted). However, it has also been observed that "[a]n ambiguous contract that cannot be resolved by credible, unambiguous, extrinsic evidence discloses genuine issues of material fact . . . [and] summary judgment is inappropriate." *Sempione v. Provident Bank*, 75 F.3d 951, 959 (4th Cir. 1996).

### III.    DISCUSSION

In their motion for summary judgment, Allied World seeks the following declarations: (1) that all claims asserted in the underlying civil actions are "related claims" as defined in the Primary Policy, subject to a single $1 million limit of liability; (2) that the Primary Policy's limit of liability is being reduced by Allied World's payment of defense expenses in the underlying civil actions; (3) that there is no coverage under the Excess Policy for the underlying civil actions; (4) that DS Holdings is not a covered insured under either of the policies; and (5) that the DS Entities are not entitled to *Hayseeds* damages.  (ECF No. 251.)  The DS Entities and Claimants' motions for partial summary judgment advance many of the same issues.  However, in addition, Claimants seek a declaration that Allied World must apply the highest per claim limit of liability afforded under the applicable insuring agreements to the underlying claims.  (ECF No. 271.)

In cases grounded in diversity jurisdiction, a federal court is "obliged to apply the substantive law of the state in which it sits." *Volvo Constr. Equip. N. Am. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 599–600 (4th Cir. 2004) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938)). Under West Virginia law, language in an insurance policy should be given its "plain, ordinary meaning."  Syl. Pt. 8, *Cherrington v. Erie Ins. Prop. & Cas. Co.*, 745 S.E.2d 508, 511 (W. Va. 2013) (citations omitted).; *Nationwide Mut. Ins. Co. v. Hatfield*, 2005 WL 2978046, *2 (S.D. W. Va. Nov. 7, 2005) ("In examining language of an insurance policy, words and phrases are to be given their 'plain, ordinary meaning unless they are specifically defined in the policy.'") (internal citation omitted).  If, after giving the language its customary meaning, the provisions in an insurance policy "are plain and unambiguous and where such provisions are not contrary to a statute, regulation, or public policy, the provisions will be applied and not construed."  Syl. Pt. 1, *Kelly v. Painter*, 504 S.E.2d 171, 172 (W. Va. 1998).  Whether a contract is ambiguous is a

question of law. Syl. Pt. 4, *Blake v. State Farm Mut. Auto. Ins. Co.*, 685 S.E.2d 895, 897 (W. Va. 2009) (noting "[t]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous"). Courts must give full effect to the plain meaning of clear and unambiguous insurance policy contract provisions. *Id.* at Syl. Pt. 2. If, on the other hand, a provision is ambiguous, courts are to construe it "against the drafter, especially when dealing with exceptions and words of limitation." *Boggs v. Camden-Clark Mem'l Hosp. Corp.*, 693 S.E.2d 53, 58 (W. Va. 2010) (quotations and citations omitted); *First Mercury Ins. Co., Inc. v. Russell*, 806 S.E.2d 429, 435–36 (W. Va. 2017) (stating, "[w]here the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated.").

An ambiguous policy provision is one "reasonably susceptible of two different meanings or of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning." Syl. Pt. 3, *Glen Falls Ins. Co. v. Smith*, 617 S.E.2d 760 (W. Va. 2005). This liberal construction, however, "should not be unreasonably applied to contravene the object and plain intent of the parties." *Id.* at Syl. Pt. 4 (internal citation omitted). A court is "obligated to give an insurance contract that construction which comports with the reasonable expectations of the insured." *Burr v. Nationwide Mut. Ins. Co.*, 359 S.E.2d 626, 631 (W. Va. 1987); *Glen Falls Ins. Co.*, 617 S.E.2d at 768 ("The standard is that of what a reasonable person standing in the shoes of the insured would expect the language to mean.").

Regardless of whether the language is ambiguous or unambiguous, "[a]n insurance company seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion." *State ex rel. Nationwide Mut. Ins. Co. v. Wilson*, 236, 778 S.E.2d 677, 685 (W. Va. 2015) (citing Syl. Pt. 7, *Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.*, 356 S.E.2d 488 (W. Va. 1987)). Thus, in cases involving a determination of the scope of insurance coverage, the insured "bears the burden of establishing a prima facie case that

the claim falls within the scope of coverage. Once a prima facie case has been established, the burden shifts to the insurer to demonstrate that an exclusion applies." *Runion v. Minnesota Life Ins. Co.*, 2013 WL 2458541, *2 (S.D. W. Va. June 6, 2013) (internal citation omitted).

### A. Related Claims

Allied World argues that all of the underlying claims are "related claims," subject to a single $1 million per claim limit of liability, because each Claimant has alleged a common pattern of sexual misconduct against Matulis that occurred at facilities operated or managed by the DS Entities. (ECF No. 251 at 11–16.) The Primary Policy defines "related claims" as follows:

> [A]ll Claims based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events, whether related logically, causally or in any other way.

(ECF No. 115-19 at 21–22.) The policy continues by stating that "Related Claims . . . shall be deemed to be a single Claim and shall be deemed to have been first made on . . . the date on which the earliest Claim within such Related Claims was received by an Insured[.]" (*Id.* at 28–29.)

The DS Entities argue that the policy's definition of "related claims" is circular such that the meaning is indeterminate and could be used to relate any two claims. But the defendants cite no legal authority to support the implied assertion that the term is ambiguous and devoid of meaning. Courts, including the Fourth Circuit, have found similar related claims provisions to be unambiguous. *See, e.g., Nomura Holding Am., Inc. v. Fed. Ins. Co.*, 629 F. App'x 38, 40 (2d Cir. 2015) (applying New York law and interpreting the plain language of an identical related claims provision); *Health First, Inc. v. Capitol Specialty Ins. Corp.*, 747 F. App'x 744, 751 (11th Cir. 2018) (applying Florida law and interpreting the plain language of the same related claims provision as broad enough even to "reach conduct with a somewhat attenuated connection.");

*Direct Gen. Ins. Co. v. Houston Cas. Co.*, 139 F. Supp. 3d 1306, 1315 (S.D. Fla. 2015), *aff'd sub nom.* 661 F. App'x 980 (11th Cir. 2016) (applying Tennessee law and finding that the same related claims provision is "very broad" and "requires only that the claims 'indirectly aris[e] out of' related circumstances." (alteration in original)); *see also W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*, 814 F.3d 171, 176 (4th Cir. 2016) (applying Maryland law and finding "interrelated wrongful acts," defined in the policy as "any wrongful acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event," to be "expansive" and unambiguous). Although they applied the law of different states, these decisions nonetheless are instructive and suggest that courts should defer to the plain language of broad related claims provisions.[4] As the related claims definition here is identical to that in *Nomura*, *Health First*, and *Direct General* and bears a strong resemblance to the definition in *Miller*, the Court concludes that the Primary Policy's related claims provision is unambiguous and, likewise, expansive and broad in scope.[5]

Rather than apply the plain meaning of the term as defined in the policy, Claimants urge this Court to apply a separate approach to determine whether claims are related. Specifically, Claimants suggest that the Court should consider "whether the claims arise out of separate factual circumstances and give rise to separate causes of action." (ECF No. 280 at 15.) In so arguing, Claimants rely on this Court's interpretation and application of an occurrence-based policy in

---

[4] New York, Florida, and Tennessee's guiding principles of policy construction are cornerstones of West Virginia insurance law. *See Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So.2d 161, 165 (Fla. 2003) (reciting rules applied in Florida that insurance contracts are construed according to their plain meaning, with any ambiguities construed against the insurer and in favor of coverage); *XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*, 874 F. Supp. 2d 263, 281 (S.D. N.Y. 2012) (same under New York law); *Alcazar v. Hayes*, 982 S.W. 2d 845, 848 (Tenn. 1998) (same under Tennessee law).

[5] Courts applying West Virginia law have also interpreted the phrase "arising out of" broadly. *See, e.g., Norfolk S. Ry. Co. v. Nat'l Union Fire Ins. of Pittsburgh, PA*, 999 F. Supp. 2d 906, 913 (S.D. W. Va. 2014) (acknowledging that "courts are in agreement that 'arising out of' indicates a broad meaning such as 'originating from,' 'growing out of,' 'incident to,' or 'flowing from'"); *Erie Ins. Prop. & Cas. Co. v. Edmond*, 785 F. Supp. 2d 561, 573 (N.D. W. Va. 2011) (stating that an exclusion using the phrase "arising out of" was "broad").

*Brotherhood Mutual Ins. Co. v. Bible Baptist Church*, 2:16-cv-00341, 2017 WL 6061979 (S.D. W. Va. Dec. 7, 2017). In *Brotherhood*, the Court looked to events that triggered liability to determine whether the events constituted separate or single "occurrences" as that term was defined in the policy. *Id.* at *4–5. However, unlike the Primary Policy at issue here, the policy in *Brotherhood* did not define "related claims" nor did it involve the same relatedness provision. Further, the policy there expounded on the issue of relatedness in the context of sexual abuse, stating that "[a]ny of the above acts or conduct will be considered a single sexual act if undertaken by the same perpetrator or perpetrators, even if such acts are directed against more than one person, happen over time, or take place during more than one policy period." *Id.* at *4. Thus, the reasoning of this case has no application here.

The other cases relied upon by Claimants are also inapposite because they involve markedly different relatedness provisions. *See, e.g., Kopelwitz v. Home Ins. Co.*, 977 F. Supp. 1179, 1188 (S.D. Fla. 1997) (involving narrower relatedness provision); *KB Home v. St. Paul Mercury Ins. Co.*, 621 F. Supp. 2d 1271, 1272, 1277 (S.D. Fla. 2008) (involving narrower "interrelated wrongful employment practices" definition); *Methodist Healthcare v. Am. Int'l Specialty Line Ins. Co.*, 310 F. Supp. 2d 976, 980–81 (W.D. Tenn. 2004) (involving relatedness language in an exclusion inapplicable on other grounds); *Beaufort Cty. School Dist. v. United Nat'l Ins. Co.*, 709 S.E.2d 85, 91 (S.C. Ct. App. 2011) (finding that policy's particular definition of sexual abuse, unlike the language here, precluded separate victim's claims from being treated as a single related claim); *Home Ins. Co. of Ill. v. Spectrum Information Technologies, Inc.*, 930 F. Supp. 825, 834 (E.D. N.Y. 1995) (involving narrower relatedness provisions).

Having found that the related claims provision is unambiguous, the Court must now determine whether the underlying claims are in fact related under the plain language of the policy.

Allied World argues that all of the underlying claims are based on Matulis' alleged pattern of sexually abusing female patients while they were under anesthesia for gastroenterology procedures and, thus, are related. (ECF No. 251 at 15–16.) The DS Entities and Claimants attempt to defeat Allied World's relatedness argument by contending that the question of whether these claims are related is contingent on the juries' resolution of facts in the underlying lawsuits that allegedly give rise to these claims. They argue that the underlying claims assert various theories of liability based on distinct acts or instances of wrongdoing by the DS Entities, separate from and unrelated to the alleged sexual misconduct. For instance, they highlight that, in addition to alleging that the DS Entities are vicariously liable for the alleged sexual abuse by Matulis, the underlying claims allege that the DS Entities "breached a right of privacy, allowed Dr. Matulis to perform colonoscopies too quickly, failed to properly document procedures, failed to properly supervise staff, breached a duty to report, failed to obtain informed consent from their patients, and negligently detained the plaintiff(s)." (ECF No. 279 at 13.) They also note that the underlying claims assert medical negligence claims for failing to provide reliable, standard of care procedures. (ECF No. 280 at 7–11.) It is on these grounds that the DS Entities and Claimants contend that this declaratory judgment action is premature with respect to this issue.

"Whether an indemnification issue is ripe for adjudication depends on the facts and circumstances of the case under consideration," but an "important factor" is "whether resolution of the tendered issue is based upon events or determinations which may not occur as anticipated." *Camden-Clark Mem'l Hosp. Corp. v. St. Paul Fire & Marine Ins. Co.*, 717 F. Supp. 2d 529, 539 (S.D. W. Va. 2010) (quoting *A/S J. Ludwig Mowinckles Rederi v. Tidewater Constr. Corp.*, 559 F.2d 928, 932 (4th Cir. 1977)). Federal courts have routinely held that indemnity claims are unripe until the alleged indemnitee's liability has been fixed by a judgment or settlement. *See, e.g.,*

*Tidewater*, 559 F.2d at 932; *Armstrong v. Alabama Power Co.*, 667 F.2d 1385, 1388–89 (11th Cir. 1982); *Cunningham Bros., Inc. v. Bail*, 407 F.2d 1165, 1169 (7th Cir. 1969). In *Tidewater*, the Fourth Circuit held that an indemnification issue was premature, stating the following:

> there has been neither a determination of liability nor a settlement in any of the [underlying] actions pending against [the parties]. We cannot tell at this time what the outcome of those actions will be . . . . The fact that [the parties] have already incurred some expenses in defending those actions does not make ripe their claims for indemnification against all potential liability and expenses. We conclude that a ruling on indemnification in the setting presented to the district court was premature.

*Tidewater*, 559 F.2d at 932. Unless a court first determines that the negation of a duty to defend will also negate a duty to indemnify, ripeness concerns typically foreclose a ruling on its duty to indemnify. *Camden-Clark Mem'l Hosp. Corp.*, 717 F. Supp. 2d at 539.

In this case, Allied World concedes its duty to defend and indemnify against these underlying claims. It only seeks to resolve distinct questions about the scope of coverage, including whether the underlying claims are "related claims" under the Primary Policy. There are no ripeness concerns with addressing this question because it is not contingent upon the resolution of unsettled events.

Although Claimants assert somewhat varying theories of liability and individual harm, the inquiry is whether the underlying claims are "based on, aris[e] out of, directly or indirectly result[] from, in consequence of, or in any way involve[] the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events, whether related logically, causally or in any other way." (ECF No. 115-19 at 21–22.) *See Zunenshine v. Exec. Risk Indem., Inc.*, No. 98-9251, 1999 WL 464988, at *2 (2d Cir. June 29, 1999) (applying similar exclusionary provision and finding that "it is immaterial that the two lawsuits involved different parties and somewhat different legal harms (negligent

misrepresentation vs. securities fraud), because the above-quoted policy terms clearly focus on the existence of common *facts*.") (emphasis in original). Here, most of the theories of liability asserted in the underlying claims, including, *inter alia*, failure to report, failure to obtain informed consent, and invasion of privacy, are based on the same factual allegations. As Allied World describes, all of the underlying claims include allegations that Matulis engaged in a pattern of sexually abusing female patients while under anesthesia. In particular, each Claimant alleges that she is a former patient of Matulis,[6] that Matulis performed a gastroenterology procedure on her, that the procedure took place at Day Surgery while she was under anesthesia, that she subsequently learned that Matulis engaged in a pattern of sexually abusing female patients while they were under anesthesia, that she now believes she was, or may have been, a victim of sexual abuse by Matulis while she was under anesthesia, that Day Surgery knew or should have known about Matulis' sexual abuse of patients, that Day Surgery had a duty to properly supervise Matulis in his practice at Day Surgery, and that Day Surgery's failure to properly supervise Matulis allowed Claimants to be harmed. Claimants naming DS Holdings as a defendant each contain allegations against DS Holdings equivalent to those against Day Surgery.

Notably, two of the claimants, A.G. and P.P., also assert negligence claims based on facts wholly unrelated to the alleged sexual misconduct. In A.G.'s Amended Complaint,[7] she alleges the following:

> 24. Dr. Matulis deviated from accepted standards of medical care by failing to comply with the minimum time requirements for the careful withdrawal of the colonoscope from Plaintiff during the . . . colonoscopy as he withdrew the colonoscope too rapidly. As a proximate result, the colonoscopy Dr. Matulis performed on Plaintiff was not medically reliable, should not be used to make diagnostic decisions about Plaintiff, and it is reasonably necessary for Plaintiff to

---

[6] Several Claimants allege loss of consortium claims as the spouse of female Matulis patients.
[7] P.P., who provided a separate notice of claim, is a representative member of the class proposed in A.G.'s Amended Complaint.

be given the option to receive a new colonoscopy by a competent physician within the standard of care, and at the expense of Dr. Matulis and any other Defendant liable for his conduct.

. . .

32. [Day Surgery] deviated from the standard of care by either failing to implement . . . quality assurance or performance review or by doing so in an unreasonable and inadequate manner with respect to Dr. Matulis.

(ECF No. 115-6 at 7 ¶ 24, 8 ¶ 32.)  Claimants argue that these assertions are based on allegations that Day Surgery failed to collect and track procedure reliability data, including the scope withdrawal times, that demonstrate compliance with practice guidelines.[8]  (ECF No. 280 at 7.) Still, despite the different theory of liability, the common factual basis for this cause of action remains the same: the procedure Matulis performed on a former anesthetized, female patient. Regardless of the alleged sexual misconduct, these underlying claims are all based on the same actions or inactions by the DS Entities in relation to Matulis' gastroenterology procedures.  The broad language of the policy includes claims that arise from a "series" of related facts or events. *See Highwoods Properties, Inc. v. Exec. Risk Indem., Inc.*, 407 F.3d 917, 924 (8th Cir. 2005) (defining a "series" as "a number of things or events of the same class coming one after another in spacial or temporal succession.").  These series of procedures, or events, that gave rise to the underlying claims, though not identical, were arguably "related" in any common understanding of the word.  *See Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1264 (11th Cir. 2000) (per curiam) (finding "different types of acts . . . aimed at a single particular goal . . . [that] resulted in a number of different harms to different persons" to be related claims).  To hold otherwise would require

---

[8] The J.W. Claimants contend that they also assert a medical negligence claim based on this unresolved fact.  However, based upon a review J.W.'s operative complaint, the Court finds this unconvincing.  Unlike A.G.'s complaint, J.W.'s pleading does not allege facts unrelated to the alleged sexual abuse.  Although J.W. alleges that Day Surgery "breached the applicable standard of care and caused Plaintiff's injury by failing to provide reliable colonoscopies and flexible sigmoidoscopy procedures to reliably investigate [J.W.'s] medical condition," (ECF No. 270-7 at 9 ¶ 46), this paragraph goes on to state that "[i]n settling of all the sexual misconduct allegations, a patient cannot reasonably rely on the medical judgment, reported findings, and lack of reported finding of Day Surgery's owner/member."  (*Id.*) Thus, this claim undoubtedly is based upon the alleged sexual abuse.

this Court to draw arbitrary lines concerning relatedness, which it is precluded from doing where the language of a policy is unambiguously broad, as is the related claims provision here.

Accordingly, as a side-by-side review of the underlying complaints reveals that all of the underlying claims are based on the same or related conduct by the DS Entities in relation to a series of Matulis' gastroenterology procedures, the Court finds that underlying claims are "related claims" and subject to a single limit of liability.

### B.    *Applicable Limit of Liability*

Claimants aver that multiple limits of liability afforded under the Primary Policy apply to the underlying claims. They contend that because Claimants have asserted claims against the DS Entities, which do not relate to sexual misconduct or trigger Endorsement No. 4, Allied World must apply the highest of the applicable liability limits.[9] (ECF No. 271 at 17.) Claimants point to a stated condition in the Primary Policy, which provides that "[i]n the event a Claim is first made against the Insured during the Policy Period that involves more than one (1) Insurance Agreement hereunder, it is understood and agreed that … one (1) Limit of Liability will apply to such Claim, which shall be the highest applicable per Claim Limit of Liability . . . ." (ECF No. 115-19 at 27.)

Allied World argues that, because each claim contains sexual misconduct allegations, the only limit of liability under the Primary Policy available for the underlying claims is the $1 million limit under Endorsement No. 4. (ECF No. 282 at 3–6.) Allied World relies on language in Endorsement No. 4, which states as follows:

---

[9] Claimants further argue that the ultimate determination of what limit of liability will apply to each underlying claim cannot be determined until the underlying claims are decided. Thus, they do not ask this Court to determine under which insuring agreement any potential limit of liability must be paid. Rather, Claimants ask for a declaration that the Primary Policy requires Allied World to pay the highest applicable per claim limit of liability. (ECF No. 271 at 18–19.) The Court is perplexed by Claimants' argument because the Primary Policy does not appear to afford a per claim limit of liability under any insuring agreement that is higher than $1,000,000, as provided under Endorsement No. 4. (*See* ECF No. 115-19 at 2 (the declarations under the Primary Policy providing for a $1,000,000 maximum limit of liability for each claim under all insuring agreements).) Despite its irrelevancy, the Court addresses this issue herein.

[A $1,000,000 per Claim] Limit of Liability shall apply to *all allegations set forth in the Claim* against the Insured, *regardless of whether or not all such allegations are expressly stated to relate to sexual misconduct or sexual abuse.* No other Limit of Liability under this Policy shall be available with regard to such Claim.

(ECF No. 115-19 at 8 (emphasis added).) All that is necessary to trigger Endorsement No. 4 are "Claims *alleging* sexual misconduct or sexual abuse." (*Id.* (emphasis added.)) Thus, it is irrelevant for purposes of determining the applicable limit of liability whether the underlying claims also include allegations unrelated to sexual misconduct or abuse. However, as Claimants further argue, Endorsement No. 4 explicitly adopts the conditions set forth in the Primary Policy, including the provision highlighted by Claimants. (*See id.* at 9 (stating "[i]t is expressly agreed that the coverage afforded by this Endorsement shall be subject to . . . the Conditions stated to be applicable to Insuring Agreements I.A. and I.C.").) This term in the main body of the Primary Policy, which allows for the highest applicable limit of liability, renders the language in the endorsement superfluous and meaningless. In other words, these conflicting provisions are not fully reconcilable nor can they both be complied with.

Generally, where an "endorsement conflicts with the main policy, the endorsement controls." *Capital City Real Estate, LLC v. Certain Underwriters at Lloyd's London*, 788 F.3d 375, 379 (4th Cir. 2015) (applying Maryland law); *Cordova v. Scottsdale Ins. Co.*, 5 F. App'x 142, 148 (4th Cir. 2001) (applying Pennsylvania law and finding that "[w]here . . . an amendatory endorsement has been issued containing terms which conflict with those in the main policy, the endorsement's terms prevail."); *In re United Indus. Servs., Inc.*, 85 F.3d 617 (4th Cir. 1996) (applying Texas law and stating that "when an insurance policy contains an endorsement that conflicts with another provision in the insurance policy, the endorsement controls."). Claimants suggests that an endorsement with restrictive terms cannot be enforced over conflicting terms in the primary policy with expanding coverage, but this proposition is contrary to basic insurance

principles that allow parties to modify an insurance policy by issuing an amendatory endorsement. *See Flowers v. Max Specialty Ins. Co.*, 761 S.E.2d 787 (W. Va. 2014) (finding that available coverage was limited to $25,000 under an endorsement to the CGL policy, rather than the $1 million limit that was otherwise available under the CGL coverage part); *see also Travelers Prop. Cas. Co. of Am. v. Salt 'N Blue LLC*, 731 F. App'x 920, 924 (11th Cir. 2018) (noting that "[an] [e]ndorsement is not ambiguous because it limits the scope of the general coverage grant under the [primary policy].").

There is no evidence, nor do the parties argue, that this endorsement was adopted unilaterally without Day Surgery's consent, such that it had other reasonable expectations regarding the terms of the contract. *See Am. Equity Ins. Co. v. Lignetics*, 284 F. Supp. 2d 399, 406 (N.D. W. Va. 2003) (explaining that a court may consider the "reasonable expectations" of an insured when an exclusion is "not communicated to the insured" or "there is a misconception about the insurance purchased."). Accordingly, the Court finds that the terms of Endorsement No. 4 control, and the $1 million limit of liability applies to the underlying claims.

### C. Defense Expenses

The Primary Policy provides $1 million in coverage for claims that fall under Endorsement No. 4. (ECF No. 115-19). Endorsement No. 4 states that the "coverage provided under this Endorsement shall be subject to" a "1,000,000 per Claim" limit of liability. (*Id.*) Allied World seeks a declaration that this $1 million per claim limit in liability is reduced by Allied World's payment of defense costs. In so arguing, Allied World relies on language contained in Endorsement No. 4, which it labels "the Exhaustion Provision." (ECF No. 282 at 6.) The Exhaustion Provision provides that "[t]he Insurer's obligations with regard to such Claim shall

cease once the Limit of Liability stated above has been exhausted by the payment of Loss or Defense Expenses." (ECF No. 115-19 at 8.)

The DS Entities and Claimants argue that the Primary Policy does not permit Allied World to reduce the applicable limit of liability by its payment of defense expenses. The DS Entities note that "before Defense Expenses can exhaust the limit of liability, it must first be established that those payment will reduce the limit of liability." (ECF No. 290 at 3.) Indeed, there is no language in Endorsement No. 4 that definitively states that the payment of defense expenses will reduce the limits of liability. Instead, the Exhaustion Provision only makes clear that Allied World's obligations to provide coverage will cease when the limit of liability is exhausted. Although the provision goes on to state that the limits may be "exhausted by the payment of Loss or Defense Expenses", the use of the word "or" in the phrase "Loss or Defense Expenses" suggests that exhaustion might occur by either the payment of Loss, Defense Expenses, or both.[10] *See State v. Wilkerson*, 738 S.E.2d 32, 38 (W. Va. 2013) (recognizing, "[t]he use of the word 'or' indicates an alternative choice." (footnote omitted)). This disjunctive or alternative term for potential exhaustion creates an ambiguity that must be construed against Allied World.[11] *See, e.g., Aetna Cas. & Sur. Co. v. Pitrolo*, 342 S.E.2d 156, 160 (W. Va. 1986) (noting that, because insurance policies are prepared solely by insurers, "any ambiguities in the language of insurance policies must be construed liberally in favor of the insured."); *Horace Mann Ins. Co. v. Leeber*, 376 S.E.2d 581, 584 (W. Va. 1988) (same).

---

[10] The Primary Policy reinforces that "Defense Expenses" shall not include "Loss" and "Loss" shall not include Defense Expenses. (ECF No. 115-19 at 18, 19–20 (defining "Defense Expenses" and "Loss").)

[11] Claimants posit that the phrase "Loss or Defense Expenses" in the Exhaustion Provision is a typographical error that creates an ambiguity because it is inconsistent with the remainder of Endorsement No. 4 and the Primary Policy. (ECF No. 271 at 16.) In particular, Claimants point to provision A of Endorsement No. 4, which states that "The Insurer will pay, on behalf of the Insured, Loss and Defense Expenses . . . ." (ECF No. 115-19 at 8.)

Reasonable minds might be uncertain or disagree as to the meaning of the Exhaustion Provision, particularly given Allied World's use of clear language throughout the policies expressing its intentions to either reduce or not reduce the limit of liability by defense costs. Section IV of the Primary Policy states that "Defense Expenses are in addition to the Insurer's Limit of Liability, and payment of Defense Expenses by the Insurer will not reduce the applicable Limit of Liability." (ECF No. 115-19 at 26.) Further, the Excess Policy specifies that "Defense Expenses shall reduce the Limit of Liability" provided under that policy. (ECF No. 115-20 at 29.) Because the Primary Policy expressly states that "payment of Defense Expenses by the Insurer will not reduce the applicable Limit of Liability" and nothing in Endorsement No. 4 contains a contrary provision, the Court finds that the limit of liability under the Primary Policy may not be reduced by the payment of defense expenses.

### D. Excess Policy Coverage

Next, the Court considers Allied World's Excess Policy. Allied World contends that the underlying claims are not covered under the Excess Policy because the Excess Policy, like the Primary Policy, also contains an exclusion for sexual misconduct allegations. (ECF No. 251 at 17–18.) The Excess Policy provides the following:

> This Policy shall not apply to any Claim based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:
>
> . . .
>
> any actual or alleged sexual misconduct or sexual abuse, including, but not limited to, any physical acts or oral statements of a sexually suggestive manner, or any unwelcome physical contact or touching[.]

(ECF 115-20 at 23, 27.) The DS Entities and Claimants assert several arguments in support of their contention that the Excess Policy provides coverage. First, they argue that Insuring Agreement C of the Excess Policy provides follow form coverage intended to cover claims covered by the Primary Policy. The "Excess Follow Form Liability" coverage provides as follows:

The Insurer will pay on behalf of the Insured, subject to the Limits of Liability set forth in the Declarations, Loss and Defense Expenses in excess of the Applicable Underlying Limit for the insurance identified in the Schedule of Underlying Insurance or Self-Insurance which the Insured becomes legally obligated to pay as a result of a Claim covered by such Scheduled Underlying Insurance or Self-Insurance. The terms and conditions of such Scheduled Underlying Insurance are, with respect to this Insuring Agreement C., made a part of this Policy, except with respect to:

    1.   any contrary provision contained in this Policy; or

    2.   any provision in this Policy for which a similar provision is not contained in the Scheduled Underlying Insurance;

in which case the provisions of this Policy will apply. In no event will the coverage provided under this Policy be broader than the coverage provided under the Scheduled Underlying Insurance. Notwithstanding anything to the contrary contained above, if the Scheduled Underlying Insurance does not provide coverage, for reasons other than exhaustion of the Applicable Underlying Limit due to the payment of Claims, then this Insuring Agreement C. similarly will not provide coverage.

(ECF No. 115-20 at 12.) The DS Entities cite *Exec. Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.*, No. 2:08-cv-00810, 2011 WL 1833194, at *9 (S.D. W. Va. May 12, 2011) for the proposition that "[a]n excess policy that follows form is designed to match the coverage provided by the underlying policy . . . ." *Id.* at *9 n.8. Although the Excess Policy provides much secondary coverage, Insuring Agreement C does not follow the form of the Primary Policy in all respects. Indeed, the Excess Policy has many definitions, exclusions, conditions, and endorsements of its own that are not included in the Primary Policy. Further, the follow form coverage under Insuring Agreement C distinctly provides that "[t]he terms and conditions of [the Primary Policy] are . . . made a part of this Policy, except with respect to any contrary provision contained in this Policy . . . ." (ECF No. 115-20 at 12.) Many of the Excess Policy's terms and conditions mirror those in the Primary Policy. Critically, the Excess Policy contains a nearly identical sexual misconduct

exclusion as the Primary Policy, but it does not contain an endorsement, like Endorsement No. 4, that overrides that exclusion.

Endorsement No. 4 provides that "[n]otwithstanding Section III.D.4 of this Policy, the following [coverage] will be added to the Policy[.]" (ECF No. 115-19 at 8.) In effect, Endorsement No. 4 operates as an amendment or addition, which changes the terms and scope of coverage provided under the Primary Policy with respect to claims involving actual or alleged sexual misconduct or abuse. This endorsement cannot be read to similarly modify the exclusionary provisions in the Excess Policy. The Court finds that the "contrary [exclusionary] provision" in the Excess Policy limits coverage afforded under Insuring Agreement C's follow form coverage.

The DS Entities and Claimants also argue that the Excess Policy may provide coverage to Day Surgery if the trier of fact finds that no sexual misconduct occurred in the underlying lawsuits. In such case, they contend that the Excess Policy's sexual misconduct exclusion will not preclude coverage. (ECF No. 280 at 19.) Like the Primary Policy, the Excess Policy contains a sexual misconduct exclusion that unambiguously states that "[t]his Policy shall not apply to any Claim based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving . . . any actual or alleged sexual misconduct or sexual abuse, . . . ." (ECF No. 115-20 at 23, 27.) As noted above, all Claimants, but for A.G. and P.P., base their underlying claims on the alleged sexual misconduct by Matulis. Future jury findings are irrelevant because these underlying claims are solely based on the alleged sexual misconduct. Therefore, the Excess Policy's sexual misconduct exclusion precludes coverage for these underlying claims, regardless of the outcome. However, a determination of whether A.G. and P.P's underlying claims, which involve allegations unrelated to sexual misconduct, are covered by the Excess Policy would be premature. This question depends on a finding by the trier of fact as to whether A.G. and P.P's injuries arose solely

from the alleged sexual abuse by Matulis or also from unrelated, negligent conduct by Matulis. As such, this issue is not ripe for this Court's consideration at this time. Consequently, this claim for declaratory relief is **DISMISSED WITHOUT PREJUDICE** until the underlying claims are resolved.

### E. DS Holdings is an Insured Under the Primary Policy

Allied World seeks a declaration that DS Holdings does not meet the definition of an Insured under the Primary Policy because it is neither a "Named Insured," "Insured Entity," or "Employee." (ECF No. 251 at 19.) In support of this argument, Allied World relies on a portion of the Primary Policy's definition of insured. "Insured" is defined in the Primary Policy as "any of the following: 1. the Named Insured; 2. any Insured Entity; 3. Any Employee, except for any employed physician or surgeon providing direct patient care, but only while acting within the scope of his/her duties as such[] . . . ." (ECF No. 115-19 at 18.) However, Allied World's quotation of the definition of insured is incomplete. The Primary Policy's definition continues by stating that, "solely with respect to Insuring Agreements A. and B., Insured shall also mean . . . any Management Company . . . ." (*Id.* at 18–19.) The policy expressly limits coverage for any Management Company "to Claims arising out of Management Company Professional Services performed for or on behalf of the Named Insured, . . . ."[12] (*Id.* at 19.)

J.W., D.C., R.L., and T.W.'s operative complaints all allege that DS Holdings is the "Manager" of Day Surgery, the named insured under the policy, and is liable for conduct related to Management Company Professional Services. (ECF No. 270-7; ECF No. 115-10; ECF No. 115-12; ECF No. 115-14.) Further, Insuring Agreement A of the Primary Policy provides for

---

[12] Under the policy, "Management Company Professional Services" includes, among other things, " . . . staffing of surgery centers, . . . drafting of protocols, policies & procedures, including creation and maintenance of a manual, and training of surgery center personnel; quality assurance/risk management, [and] negotiations of third party/vendor contracts[.]" (ECF No. 115-19 at 20.)

"Claims Made Professional Liability" coverage for a "Claim alleging a Medical Professional Incident." (ECF No. 115-19 at 16.) A "Medical Professional Incident" means "an actual or alleged act, error or omission in the Insured's rendering of or failure to render Medical Professional Services; [or] … any actual or alleged act, error or omission in connection with the Insured's performance of quality assurance activities." (*Id.* at 20.)

Allied World does not dispute that DS Holdings is a Management Company performing Management Company Professional Services as that term is defined under the policy. Instead, as the DS Entities observe, "Allied World appears to take the position that (1) the coverage provided by Endorsement No. 4 is a separate grant of coverage, exclusive of coverage provided under the named Insuring Agreements of the Policy, and (2) that claims against DS Holdings cannot trigger coverage under both Endorsement No. 4 and other Insuring Agreements in the Policy." (ECF No. 268 at 15.) Allied World points to language in Endorsement No. 4 which states that "[n]o other limit of liability under this Policy shall be available with regard to [a Claim covered by Endorsement No. 4].'" (ECF No. 115-19 at 8.) Based on this provision, Allied World contends that "only Endorsement No. 4—and not Insuring Agreements A or B—afford coverage for the [underlying claims.]" (ECF No. 282 at 14.)

Allied World's argument is a confusing leap in logic. There is no support for Allied World's claim that Endorsement No. 4 is a separate grant of coverage that precludes coverage under all other insuring agreements in the Primary Policy. *See Bland v. State*, 737 S.E.2d 291, 305 (W. Va. 2012) (noting that generally, under West Virginia law, "an endorsement to an insurance policy is intended to modify the portion of the policy so indicated in the endorsement, not to serve as a complete replacement of an insurance policy."). The terms "coverage" and "limit of liability" refer to different concepts, and Allied World incorrectly applies these words synonymously.

Though not defined in the policies, generally "coverage" refers to an insurer's obligation to defend or indemnify an insured pursuant to an insurance agreement or policy while "limit of liability" refers to the maximum amount an insurer agrees to pay under that policy. Both the Primary Policy and Endorsement No. 4 state that one "limit of liability" and one "deductible" will apply to a claim. (ECF No. 115-19 at 8, 27.) Importantly, neither the policy nor the endorsement state that only one insuring agreement will apply to a claim. To the contrary, Condition A of the Primary Policy contemplates that a claim can trigger more than one insuring agreement, stating that "[i]n the event a Claim . . . involves more than one (1) Insuring Agreement hereunder, it is understood and agreed that only one (1) Deductible and one (1) Limit of Liability will apply to such Claim . . . ." (ECF 115-19 at 27.)

To read Allied World's preclusion into the policy, which restricts coverage for a claim to one insuring agreement, would be impermissible under West Virginia law. *See, e.g., Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443, 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) (applying West Virginia law and stating that the court "will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck."); *Kelly*, 504 S.E.2d at 175 (noting that the court "is not at liberty to rewrite the contract between the parties."). Based on the language of the policy, Endorsement No. 4 reinstates coverage for claims otherwise excluded by the Primary Policy's sexual misconduct exclusion, and there is no reason why those claims may not arise under any of the separate insuring agreements of the Primary Policy. Here, the allegations against DS Holdings in the J.W., D.C., R.L., and T.W. claims assert liability that is covered under Endorsement No. 4 and Insuring Agreement A. Accordingly, DS Holdings squarely falls within the definition of an insured and is entitled to coverage under the Primary Policy for the underlying claims.

*F. DS Holdings is Not an Insured Under the Excess Policy*

Claimants further argue that DS Holdings is insured under the Excess Policy. Unlike the Primary Policy, the Excess Policy's definition of insured does not include management companies. (ECF No. 115-20 at 15.) Still, Claimants argue that the Excess Policy affords pure follow form coverage under Insuring Agreement C, making the Primary Policy's definition of insured, including potential coverage for management companies, part of the Excess Policy. (ECF No. 271 at 12–13.) As discussed previously, Insuring Agreement C does not contain pure follow form language and does not incorporate those terms and conditions in the Primary Policy that are contrary to any provision contained in the Excess Policy. *See supra* at 19 (citing ECF No. 115-20 at 12). The Excess Policy's own definition of insured, which does not include management companies, is contrary to the Primary Policy's definition and, thus, applies.

Claimants also contend that DS Holdings is entitled to coverage under the Excess Policy because Day Surgery is obligated to indemnify it pursuant to an insured contract. (ECF No. 271 at 13.) "Insured Contract" under the Excess Policy means the following:

> That party of any other contract or agreement pertaining to the Insured's business under which the Insured assumes the tort liability of another party to pay for Bodily Injury . . . to a third person or organization. Tort liability means liability that would be imposed by law in the absence of any contract or agreement.

(ECF No. 115-20 at 16.) Claimants have submitted Day Surgery's operating agreement, wherein Day Surgery agrees that it "may indemnify any person, including the Manager" who is sued because it is a "Manager of [Day Surgery.]" (ECF No. 270-2 at 31–32 (Operating Agreement).) While the agreement provides that Day Surgery *may* indemnify DS Holdings, it does not obligate it to do so. In fact, Claimants have not provided any evidence to establish that Day Surgery is obligated to assume any tort liability of DS Holdings. *See Mulvey Constr., Inc. v. Bitco Gen. Life Ins. Corp.*, No. 1:07-0634, 2015 WL 6394521, at *33 (S.D. W. Va. Oct. 22, 2015) (finding

24

indemnity language that lacked an assumption of tort liability was not an insured contract under similar policy language). Therefore, any provision in the Primary Policy that might be incorporated into the Excess Policy and provide coverage for such indemnity claims is irrelevant here. As such, the Court finds that DS Holdings is not an insured under the Excess Policy.

G. *Hayseeds Damages*

As a final matter, Allied World challenges the DS Entities' claim for an award of *Hayseeds* damages. In *Hayseeds, Inc. v. State Farm Fire & Casualty*, 352 S.E.2d 73 (W. Va. 1986), the West Virginia Supreme Court of Appeals held that in cases where a policyholder prevails in a suit involving coverage against his own insurer, the insurer may be held liable for certain consequential damages. In this case, the DS Entities assert a counterclaim against Allied World for breach of contract and, as a result, seek *Hayseeds* damages. Specifically, they allege that Allied World "breached [its] duty of good faith and fair dealing by denying to [Day Surgery] the full amount of coverage available to it under the [policies] . . . ." (ECF No. 130 at 27–28 ¶¶ 9–15.) As noted above, Claimants' underlying civil actions are still pending in state court. Therefore, any ruling on the DS Entities' bad faith claim concerning Allied World's duty to indemnify could have an "advisory quality." *Camden–Clark Mem'l Hosp. Corp.*, 717 F. Supp. 2d at 540 (citing *Lear Corp. v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003)). As such, Allied World's summary judgment motion as it relates to this claim is **DENIED** as premature and the DS Entities' counterclaim is **DISMISSED WITHOUT PREJUDICE**.

IV.     *CONCLUSION*

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Allied World's motion for summary judgment, (ECF No. 250), and further **GRANTS IN PART** and **DENIES IN PART** the DS Entities and Claimants' motions for partial summary judgment, (ECF

Nos. 267, 269, 270, 272, 273, 277, 278).  Specifically, the Court **GRANTS** Allied World's motion insofar as it seeks a declaration (1) that the underlying claims are all "related claim" and, thus, deemed a single claim, subject to a single per claim limit of liability, and (2) that DS Holdings is not insured under the Excess Policy.  The Court also **GRANTS** the DS Entities and Claimants' motions insofar as they seek declarations (1) that the limit of liability under the Primary Policy may not be reduced by the payment of defense expenses, and (2) that DS Holdings is an insured under the Primary Policy.  The Court **DENIES** the motions as to the remaining issues.

  **IT IS SO ORDERED**.

  The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

     ENTER:  March 31, 2020

               _____

     THOMAS E. JOHNSTON, CHIEF JUDGE